## GLADISH v. NEELEY. (No. 8272.)

(Court of Civil Appeals of Texas. Galveston. Feb. 2, 1923.)

1. **Venue** ⬸22(3)—**Resident defendant does not defeat nonresident's plea of privilege where cause of action is separate.**

A plea of privilege by a nonresident defendant to be sued in the county of his residence cannot be defeated under Vernon's Sayles' Ann. Civ. St. 1914, art. 1830, subd. 4, authorizing suit in any county where any one of the defendants resides, when the cause of action shown against the defendant residing in the county in which the suit is brought is separate and distinct from that alleged against the nonresident defendant.

2. **Venue** ⬸22(3)—**Resident defendant guaranteeing contract is not jointly liable with nonresident.**

A bank situated in the county in which the suit was brought, which guaranteed the non-resident defendant's contract for the benefit of plaintiff and not at the request of or for the benefit of the nonresident defendant, was not jointly liable with the nonresident defendant, so that the nonresident's plea of privilege was improperly denied because of the joinder of the bank as a defendant.

3. **Venue** ⬸22(3)—**Plaintiff held to have no cause of action against resident defendant.**

A state bank has no authority under its charter to engage in a guaranty or surety business, and therefore no cause of action can be based on such guaranty, and the fact that the bank was joined as a defendant in an action against a nonresident on the contract guaranteed does not warrant the refusal of the nonresident's plea of privilege to be sued in the county of his residence.

4. **Venue** ⬸22(3)—**Good faith in seeking recovery on unenforceable guaranty is immaterial.**

The fact that plaintiff was acting in good faith in seeking recovery from a resident bank on its guaranty of a contract of nonresident defendant does not warrant the overruling of the nonresident's plea of privilege to be sued in the county of his residence, since the plaintiff is charged with knowledge that the bank could not under the law guarantee the contract.

Appeal from District Court, Leon County; Carl T. Harper, Judge.

Action by Alf Neeley against E. J. Gladish and another. From a judgment overruling the named defendant's plea of privilege to be sued in the county of his residence, that defendant appeals. Reversed, and judgment rendered sustaining the plea of privilege.

R. J. Randolph, of Madisonville, for appellant.

PLEASANTS, C. J. This appeal is from a judgment of the court below overruling a plea of privilege to be sued in the county of his residence, filed and presented by appellant. The suit was brought by appellee against the appellant and the First State Bank of Oakwood to recover damages for the alleged breach by appellant of a contract for the purchase from appellee of two carloads of hogs to be shipped by appellee from Oakwood, in Leon county, to appellant at Stratford, in Sherman county, and there paid for by appellant. The First State Bank of Oakwood was made defendant upon allegations charging that it had warranted or guaranteed the performance of the contract by the appellant, and judgment was prayed for against appellant as principal and the bank as warrantor of the contract.

Appellant's plea of privilege, which was filed and presented in due time and in proper form, alleges that the residence of appellant is in Sherman county and expressly negatives all of the exceptions contained in the statute against the rule requiring suits to be brought in the county of the defendant's residence. It also contained an exception to the petition on the ground that it fails to allege a joint cause of action against the appellant and the bank, and shows on its face that the suit against appellant cannot be maintained in Leon county. It further alleges:

"That this defendant would further represent that the plaintiff herein has made the defendant, First State Bank of Oakwood, a party for the fraudulent purpose of seeking to procure jurisdiction upon this defendant in Leon county, Tex., although plaintiff well knows that the First State Bank of Oakwood, Tex., if it has warranted the payment of any amount involved herein, did not do so at the instance, request, knowledge, consent, or acquiescence of this defendant, but for the sole and fraudulent purpose of endeavoring to deprive this defendant of his right to be sued in the county of his residence. That this defendant would further

represent and show that, if he be mistaken in any of the foregoing allegations as to said cause of action being severable, or the fraudulent purpose of plaintiff in joining the defendant, First State Bank of Oakwood, as a party defendant herein, that he alleges that there is a conspiracy between the plaintiff herein and the First State Bank of Oakwood, Tex., whereby said bank has consented and agreed with plaintiff to be made party to this suit for the sole purpose of endeavoring to confer jurisdiction upon its person and venue upon the said district court of Leon county, Tex., of the person of this defendant so as to maintain this cause of action in this court and deprive this defendant of his right to have this cause of action transferred to and tried in the district court of Sherman county, Tex., and that First State Bank of Oakwood in furtherance of said conspiracy with the plaintiff has agreed with plaintiff that in no event will it be liable for any judgment of any kind or character that might be rendered herein, but has consented and permitted that it would be made a party herein for the sole and only purpose of seeking to fraudulently confer jurisdiction and venue of this suit in the above styled court."

Appellee filed a controverting affidavit, which amplifies the allegation of the petition in respect to the warranty of the contract by the bank, and expressly denies the allegation of appellant's plea that the bank was made a party for the fraudulent purpose of giving the district court of Leon county jurisdiction of the suit against appellant, and further specifically denies the allegations of conspiracy contained in appellant's plea.

On the hearing of the plea the court overruled the exception to the petition, and after hearing the evidence rendered judgment overruling the plea.

The evidence upon the hearing was in substance as follows:

Appellant testified that he made a contract with appellee to purchase from him two carloads of hogs at nine cents per pound, f. o. b. cars at Oakwood. Appellee was to obtain a public weigher's certificate when the hogs were loaded and send it with a draft on appellant attached to appellant's bank at Stratford, for payment. After making the agreement, at appellee's suggestion, they went to the First State Bank of Oakwood, and appellee introduced appellant to Mr. J. W. Barton, the president of the bank, and submitted to him the terms of the agreement. Mr. Barton then suggested to appellant that he get his bank at Stratford to wire the Oakwood bank that any draft drawn by appellee under the agreement for the purchase of the hogs would be paid by it. Appellant agreed to this and sent a telegram to the Stratford bank prepared by Mr. Barton. In reply to this telegram the Stratford bank wrote or wired the Oakwood bank that it would guarantee payment to Mr. Neeley of any draft with public weigher's certificate attached drawn by him on appellant for the purchase price of the hogs appellant had agreed to purchase from him.

In regard to this transaction with Mr. Barton, the appellant testified:

"I took that to mean that he wanted to satisfy himself and the bank there for the protection of Mr. Neeley, and whether I was able to pay for the hogs. He did not say to me, 'Mr. Gladish, I will be glad to help you all I can with your contract in this matter.' Anything that was said or done by Mr. Neeley and the Oakwood State Bank was not for my benefit. The bank was trying to arrange some kind of way to be sure that Neeley would get his money out of those hogs. I never called upon the First State Bank of Oakwood to guarantee the performance of this contract for me."

Before the hogs were shipped, appellant wired appellee that the contract had expired and that he would only take them at the then market price.

Mr. Barton testified:

"My recollection of what took place there in the bank the day that Mr. Neeley and Mr. Gladish were in the bank is about as follows: Mr. Neeley came in and introduced Mr. Gladish and said he was figuring on a contract with him for the sale of some hogs, that Mr. Gladish had agreed to purchase one car of hogs from him, that the hogs had been shown to him there in town, that he had agreed to sell him one car of hogs at a stipulated price, to run in grade like the ones he had seen, and during the conversation I told Mr. Neeley that he would have to find out how this stuff was to be paid for before we could furnish him the money to buy the hogs. Yes, I furnished him the money with which to buy the hogs, and I told him that we would have to be satisfied where this money was coming from and how it was coming, and Mr. Gladish stated to me that he could have his bank wire us guaranteeing the payment of the draft at Oakwood. Yes, I had agreed to furnish Mr. Neeley the money to buy the hogs with. I think Mr. Gladish suggested that he would have his bank wire us. I don't think the suggestion came from me first. Anyway, Mr. Gladish had his bank up there to wire us that they would pay for these hogs, that they would honor a draft on Mr. Gladish for these hogs with the certificate of the public weigher of Oakwood attached.

"Q. Did the telegram say anything about the draft being paid at Oakwood? A. When they wire that they will pay a draft, it is understood that they will pay free of exchange. When it is paid free of exchange, that makes it payable in Oakwood. It is the custom of bankers, when one bank wires another bank that they will honor a draft drawn by a party on them, to pay the draft but to have it sent to them through regular channels. This telegram simply stated that this bank up there would honor a draft drawn by Neeley on Gladish for the purchase price of the hogs. I furnished the money to buy these hogs, and expected to get it back out of the sale to Mr. Gladish. Neeley never did draw a draft on the Stratford bank. Mr. Neeley has never paid back the money to the bank that he borrowed to buy these hogs. It is still due.

"I did not furnish any money to Alf Neeley

to buy hogs until I received that telegram from the First State Bank of Stratford. Upon receipt of that telegram—telegram or letter, I don't know which—I then told Alf Neeley to go ahead and buy the hogs, and I furnished the money. When the second telegram came, I furnished him the money to buy the second car of hogs. I have not gotten any money back on either of those cars of hogs. I made a demand on the bank at Stratford for the hogs that were shipped out and sold on the market at Fort Worth. They refused to pay. I have forgotten what their answer was, but they declined to pay. That was after Alf Neeley took the hogs to Fort Worth. It might have been three days after he came back that I wrote the bank, as soon as I could prepare a statement.

"Mr. Neeley and I relied on that telegram from the Stratford bank. I furnished the money to buy the hogs with, and Neeley bought the hogs. Mr. Gladish and Mr. Neeley were in the bank there. I asked Gladish, before I would advance the money to Neeley to buy hogs with, I required him to have his bank guarantee the payment of Neeley's draft. Mr. Gladish did not ask me, or the bank, to personally guarantee the performance of this contract that he would pay for the hogs.

"Q. It is not a fact that the reason you required that guaranty was that you didn't want to get the bank tangled up with Neeley, and you didn't want to put out any money unless you knew you were going to get it back? A. Don't any of us want to do that. * * *

"The Court: Before you let him have any money and after getting this telegram and after you had the conversation with Mr. Gladish and he went back home and you got this telegram, did you then guarantee to Neeley that the contract that he made with Gladish would be paid? A. Yes, sir; I had a guaranty from the bank, and I guaranteed him.

"The Court: You guaranteed Neeley? A. Yes, sir.

"Redirect examination:

"Mr. Randolph: Q. How did you guarantee that? Did you show Mr. Neeley a guarantee? A. I paid for the hogs.

"Q. Wasn't he paying interest on that money, and wasn't you to participate in the profits? A. I wasn't participating in the profits.

"Q. You were president of the First State Bank of Oakwood? A. Yes, sir.

"Q. Is the bank in that kind of business? Is it chartered and organized to guarantee the performance of contracts? A. I don't know whether it is in the law or not.

"The Court: What has that got to do with this case?

"Mr. Randolph: It goes to the very heart of the case as far as the bank is concerned. They were doing something that they were without authority to do. He contends that the Oakwood State Bank guaranteed the Gladish contract. He had no authority under the law to do this, and his act, and therefore the contract, was illegal."

Appellee Alf Neeley testified:

"I made a contract with Mr. Gladish to buy him a car of hogs at nine cents a pound. It was my understanding that they were to be f. o. b. cars at Oakwood with public weigher's certificate attached. I had known Mr. Gladish at that time about four hours. I talked to Mr. Gladish about shipping him the hogs, and we agreed on the price that he would pay, and we went down to the bank, and I introduced him to Mr. Barton and told Mr. Barton about the contract that we had, and then I said something about wanting to have some guaranty of being paid for these hogs. It was my understanding that they were to be paid for at Oakwood. He said he would have his bank to write the First State Bank of Oakwood and guarantee the payment of these hogs. He made the suggestion himself that the public weigher should weigh the hogs and make affidavit to the weights, and he was to pay so much a pound at Oakwood for these hogs. I told him that whenever I got a guaranty I would go a head and buy up the hogs. I didn't buy the hogs, or make any arrangement about the money to buy the hogs with, until after I got a guaranty from the Stratford bank. Mr. Barton said that he got that confirmation, and he called me up and said that he would put up the money to buy the hogs. I have demanded of the First State Bank of Oakwood, or its president, that he comply with that guaranty, and he refused. No, I have never agreed to release him from his liability under any judgment I might recover. I hold the First State Bank of Oakwood and the First State Bank of Stratford liable until I get my money. * * *

"Q. How is that you are now suing the Oakwood State Bank and asking them to pay you back some money that you have lost on this contract? A. I am suing the First State Bank of Oakwood jointly with the other concern. I am not suing them alone.

"Q. When Mr. Gladish notified you that he would not carry out the contract, or called it off, and you decided to bring the suit, when was it that you determined to include the First State Bank of Oakwood in your suit? A. Well, I will tell you. I determined from the first outset of it to bring suit against everybody that I had any shot at or that was connected with it until I was paid for those hogs, and that is what I am fighting for to-day. Yes, I notified the First State Bank of Oakwood that I was holding them on that guaranty and that they would have to make it good, and they told me that if they had to pay it that they would, but that I would have to make these other parties parties to the suit, and that is why they are sued jointly.

"Q. Were you ever told that it was necessary to make the First State Bank of Oakwood a party in order to get jurisdiction over Mr. Gladish, the defendant? A. No, sir; I never did think I would have any trouble about getting jurisdiction in Leon county when I made this trade with Mr. Gladish that these hogs were to be paid for f. o. b. cars at Oakwood, and he merely hired me to go with the hogs when they were shipped. When this telegram reached the First State Bank of Oakwood, they called me up over the telephone right away; it was not a telegram; it was just simply a letter written. The letter was that they would pay the draft drawn by Alf Neeley on E. J. Gladish for one car of hogs. The bank received that. Mr. Barton told me that he had confirmation of

the purchase of the car of hogs and that I could come in and fix it up and he would let me have the money to buy them hogs."

[1, 2] We think the pleadings and evidence before set out clearly show that appellant's plea of privilege should have been sustained. Appellee seeks to maintain his suit against appellant in Leon county under subdivision 4 of article 1830, Vernon's Sayles' Civil Statutes, which provides that where there are two or more defendants residing in different counties, suit may be brought in any county where any one of the defendants reside. This statute has been often construed, and it is well settled that when the cause of action shown against the defendant residing in the county in which the suit is brought is separate and distinct from that alleged against the nonresident defendant, the plea of privilege must be sustained. If any guaranty by the Oakwood bank is shown by the evidence, it was not given at the request or for the benefit of the appellant, or not even with his knowledge, but was a separate and distinct contract between the bank and appellee with which appellant had no concern. The liability, if any, of the defendants not being joint, the two causes of action could not be joined and appellant thereby deprived of his right to be sued in the county of his residence. Stephens v. First National Bank of New Boston (Tex. Civ. App.) 146 S. W. 620; Ry. Co. v. Mangum, 68 Tex. 346, 4 S. W. 617.

[3] We are further of the opinion that the plea should have been sustained on the ground that the undisputed evidence shows that appellee has no cause of action against the Oakwood bank, and that the bank was only made a party for the purpose of requiring appellant to answer appellee's suit in Leon county. This, in law, was a fraud upon the jurisdiction of the court that cannot be upheld. Ry. Co. v. Waddell Brothers, 38 Tex. Civ. App. 434, 86 S. W. 655.

[4] A state bank has no authority under its charter to engage in a guaranty or surety business, and if any guaranty was given by the bank to appellee it was ultra vires and unenforceable. The good faith of appellee in seeking to hold the bank on such a guaranty does not effect the question, because he is held to a knowledge of the law applicable to the fact upon which he relies to sustain his case. Groos v. Brewster (Tex. Civ. App.) 55 S. W. 590; Beauchamp v. Chester, 39 Tex. Civ. App. 234, 86 S. W. 1055.

These conclusions require that the judgment of the trial court be reversed, and judgment here rendered sustaining appellant's plea of privilege, and it has been so ordered.

Reversed and rendered.